# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

DESEAN HILL,

                        Plaintiff,

          v.                                   9:16-CV-1225
                                                (LEK/ATB)

JOSEPH T. SMITH, et al.,

                        Defendants.

---

DESEAN HILL, Plaintiff pro se
BRIAN W. MATULA, Asst. Attorney General for defendants

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report-Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

## I.   Procedural Background

Plaintiff's civil right complaint was transferred from the Southern District of New York on September 30, 2016. (Dkt. No. 4)  On November 29, 2016, after initial review, Judge Kahn dismissed some of plaintiff's claims and defendants,[1] but allowed other claims to go forward, ordering service on the remaining defendants. (Dkt. No. 10).

Plaintiff's surviving claims are as follows:

---

[1] Although Senior Judge Kahn dismissed some of these claims without prejudice to plaintiff filing an amended complaint, he failed to do so. (Dkt. No. 10 at 9-11, 13-15, 18).  Judge Kahn also dismissed co-plaintiff Tshana Rowe, plaintiff Hill's fiancé. (Dkt. No. 10 at 7).

(1)    First Amendment Free Exercise and Retaliation claims against defendants Connors, Gardner, Checchia, and Nenni. (Dkt. No. 10 at 7-9, 17).

(2)    Fourteenth Amendment equal protection claims as against defendants Connors, Gardner, Checchia, and Nenni. (Dkt. No. 10 at 15-16, 17).

(3)    An Eighth Amendment claim against defendant Nenni for the alleged poisoning of plaintiff's food. (Dkt. No. 10 at 11-13, 17).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 21). Despite being given an extension of time to respond to the defendants' motion, plaintiff has failed to do so.[2] For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

## II.    Facts

For clarity, in this section, I will review the facts as stated by Judge Kahn in his initial review of plaintiff's complaint, together with the facts as stated in the complaint. In my analysis, I will discuss the additions and modifications to those facts from the exhibits filed by defendants in support of their motion for summary judgment.[3]

Plaintiff arrived at Shawangunk Correctional Facility ("SCF") on February 11, 2016. (Dkt. No. 10 at 4; Compl. at 11). In his complaint, plaintiff alleged he was constantly harassed about wearing his "kufi,"[4] and on February 18, 2016, he filed a grievance against defendant Gardner regarding plaintiff's religious right to wear the

---

[2] The final extended deadline expired on January 24, 2018. (Dkt. No. 26).

[3] The factual allegations in plaintiff's complaint are often contradictory to his testimony at his deposition.

[4] A "kufi" is headgear associated with the Muslim religion. *Nicholas v. Tucker*, 89 F. Supp. 2d 475, 477 (S.D.N.Y. 2000).

2

kufi. (Dkt. No. 10 at 4; Compl. at 3, 11).  Plaintiff states that he was "just" issued the form to show proof that he was a Muslim, due to the harassment from defendant Gardner and Corrections Officer ("CO") North.[5]

On March 31, 2016, plaintiff received a visit from his fiancee Tshana Rowe.[6] (Dkt. No. 10 at 4; Compl. at 11).  Prior to entering the visiting area, Ms. Rowe and plaintiff were subjected to the usual "search/scan" for contraband. (Compl. at 11). Plaintiff claims that, approximately two hours into the visit, defendants Lieutenant ("Lt.") Connors and Sergeant ("Sgt.") Checchia terminated the visit because they suspected that plaintiff possessed contraband, and because he did not listen "when told to keep the kufi off [his] head."[7] (*Id.*)

After the termination of his visit, plaintiff was taken to the strip-frisk area, where he was "harassed and threatened" by defendant Nenni, who snatched the kufi from plaintiff's head. (*Id.*)  At the same time, defendant Checchia allegedly told plaintiff that "'we don't allow niggers to enjoy visits with white women." (Dkt. No. 10 at 4; Compl. at 11).  Defendant Checchia also reminded plaintiff about "what Lt. Gardner told him about 'wearing a kufi and writing grievances.'" (Dkt. No. 10 at 5).  Plaintiff was searched and then taken to an isolation cell, where he was "watched" for drugs and contraband. (Dkt. No. 10 at 5; Compl. at 12).  Plaintiff claims that as he was being

---

[5] Judge Kahn specifically found that CO North is not a defendant in this action. (Dkt. No. 10 at 4 & n.3).

[6] As stated above, Ms. Rowe is no longer a plaintiff in this action.

[7] Plaintiff claims that defendants Connors and Checchia approached plaintiff and said that they guessed "[he] didn't get the warning." (Compl. at 11).

escorted into the cell, defendant Nenni threatened his fiancé and his "food."[8] (*Id.*)

Plaintiff alleges that, while he was confined to the observation cell on April 1, 2016, he vomited "constantly" after he ate the breakfast that was brought to him. (Compl. at 12). Plaintiff states that he gave the officers "over 2 [fecal] samples" in which no contraband was found. (*Id.*) As a result, he was released from the isolation/observation cell on April 2, 2016 by "Mr. Pingotti,"[9] who told plaintiff that he was "sure" that plaintiff would have "no more white girls or file any more grievances." (*Id.*) Plaintiff also claims that Mr. Pingotti told plaintiff that he had "one surprise for [plaintiff]" to make sure that plaintiff took him seriously. (*Id.* at 5, 12).

Plaintiff was released from the observation cell at approximately 1:20pm. (*Id.*) Plaintiff claims that by 1:25pm, he had been called to submit a urine sample. (*Id.*) Plaintiff complied with the order, and on April 7, 2016, plaintiff received a misbehavior, report because his urine sample had tested positive for "drugs." (Dkt. No. 10 at 5; Compl. at 12). Plaintiff alleges that CO Strong "checked" plaintiff's urine.[10]

---

[8] Plaintiff states that he had an argument with CO Nenni "due to him . . . threatening [his] fiancé . . . poisoning my food and setting me up." (Compl. at 4).

[9] "Mr. Pingotti" is actually the Deputy Superintendent of Security ("DSS"). (Compl. at 23; Pl.'s Ex. K). He is not a defendant in this action. Defendant Connors wrote DSS Pingotti a memorandum that plaintiff has attached to his complaint. (*Id.*) The memorandum states that, during plaintiff's visit with his fiancé, DSS Pignotti observed plaintiff remove "unknown contraband" from a plastic bag and place it in his pants. (*Id.*) Plaintiff's visit was terminated based upon that observation. The memorandum further states that plaintiff was escorted from the "visit frisk" to the "observation room," and placed on a "drug watch." However, within 48 hours, and after "two acceptable" samples, he was released and directed to submit a urine sample. (*Id.*)

[10] Plaintiff claims that CO Strong was "arrested for 'Robbery.'" (Compl. at 5).

Plaintiff states that defendant Gardner "reviewed"[11] his hearing, and plaintiff was "given" thirty (30) days confinement with ninety (90) days loss of privileges. (*Id.* at 5-6; Compl. at 5, 12).

Plaintiff alleges that as he was being escorted to and from his disciplinary hearing, he was verbally harassed and threatened by CO North and defendant Gardner about removing his kufi. (*Id.* at 5-6; Compl. at 5).  Plaintiff states that he "again" filed "another" grievance "which was code #49-30129-16 and code #31-30081-16." (Compl. at 5, 12).

## III.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts

---

[11] It was unclear from the complaint what plaintiff meant by this statement.  At plaintiff's deposition, he testified that defendant Gardner was "involved" in the disciplinary hearing because he "reviewed" the tickets.  However, defendant Gardner's name does not appear on the Misbehavior Report associated with this disciplinary hearing. (Def.s' Ex. E).  It is signed by "J. Strong" and an illegible signature at the bottom that belongs to a Sergeant, who is listed as the "Area Supervisor." Defendant Gardner is a Lieutenant, so it is not defendant Gardner's signature.

by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## IV.   Exhaustion of Administrative Remedies

### A.   Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d

691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id*. § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the

7

superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2. Defendants bear the burden

of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

## B. Application

Defendants argue that although plaintiff brought, and exhausted, two grievances regarding the incidents described in his complaint, the allegations in his federal complaint go "well beyond those asserted in his grievances." (Dkt. No. 21-2 at 15). Defendants argue that the allegations in plaintiff's federal complaint which were not mentioned in either one of his two grievances should be dismissed for failure to exhaust.

During his deposition, plaintiff confirmed that he filed only two grievances regarding the incidents described in the complaint: Grievance No. 30081-16 ("#30081"), filed by plaintiff on April 4, 2016[12] and Grievance No. 30129-16 ("#30129"), filed by plaintiff on April 28, 2016.[13] (Def.s' Ex. A - Pl.'s Dep. at 78-79) (Dkt. No. 21-4).  #30081 relates to the termination of his fiancé's visit on March 31, 2016, and to plaintiff's subsequent one-on-one "drug watch" which lasted for 48 hours. (Def.s' Ex. B).  #30081 is less than one page long, and at the end plaintiff asks that this grievance be accepted as a "harassment" grievance.  In the relief section of the grievance, plaintiff asks that he not be subjected to "retaliation . . . due to the nature of **this** Grievance." (*Id.*) (emphasis added).  He did not claim that the conduct that he was challenging in the grievance was in retaliation for filing other grievances or in

---

[12] (Def.s' Ex. B) (Dkt. No. 21-5).

[13] (Def.s' Ex. C) (Dkt. No. 21-6).

retaliation for wearing his kufi.

Defendants have filed a copy of the CORC decision, dated November 23, 2016, denying #30081. (Def.s' Ex. B at 2). The CORC found that plaintiff's visit was terminated because he was observed placing an "unknown object in his pants." (*Id.*) Plaintiff was released from observation after "two negative defecations," and the urinalysis testing after the special watch was "negative."[14]  The CORC asserted that the staff's "appropriate performance of their duties and enforcement of the rules and regulations should not be construed as harassment.  However, the CORC also stated that, with respect to plaintiff's "appeal," all "relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level."[15]  (*Id.*)  The CORC found no malfeasance by staff. (*Id.*)

The second grievance - #30129 was filed by plaintiff on April 28, 2016. (Def.s' Ex. C).  In this grievance, plaintiff states that on April 27, 2016, defendant Gardner threatened plaintiff "a third time," and CO North ordered plaintiff to remove his kufi. (*Id.*)  Plaintiff claims that he told CO North that he was a Muslim, and "under the Muslim religion it's a violation." (*Id.*)  CO North allegedly told plaintiff that if he did not remove the kufi, he would be using it to wipe the blood off of his mouth. (*Id.*)

---

[14] This statement is unclear because plaintiff claims that the urinalysis test he took after the isolation cell was positive for opiates and that was the reason for the misbehavior report. (Def.s' Ex. D).  The testing was not done until April 7, 2016, but plaintiff states that the sample was taken shortly after his release from observation.

[15] It is unclear to what "information" the CORC was referring, but it appears that plaintiff may have attempted to raise new facts in his appeal of the Superintendent's decision.  While the court does not know what those facts may have been, it is clear that the CORC did not consider them properly raised, and thus, regardless of what those facts may have been, they would not support the exhaustion of plaintiff's remedies.

Plaintiff states that he then removed the kufi "while walking down 'D' corridor."  The grievance was a "complaint of verbal harassment, verbal assault and violation of [plaintiff's] religious rights." (*Id.*)

By the time the CORC decided plaintiff's appeal, he had been transferred out of SCF. (*Id.* at 2) (CORC Decision dated 3/8/17).  The CORC noted in its decision that the "facility administration" conducted a proper investigation, and both CO North and defendant Gardner denied threatening plaintiff. (*Id.*)  The grievance investigation revealed that plaintiff was told to remove the kufi because he was listed as "Protestant" in Department of Corrections and Community Supervision ("DOCCS") records.[16] (*Id.*)  The CORC noted that, in the interim, DOCCS policy had changed regarding religious items.  Inmates could now select "any of the approved religious items regardless of their Religion of Record." (*Id.*)  At his deposition, plaintiff testified that the only grievances he filed were #30081 and #30129, and that defendants' exhibits were accurate copies of the grievances that plaintiff filed. (Pl.'s Dep. at 78-79).

When a plaintiff fails to "fairly present" claims in his grievances, those claims are not exhausted. *Beckles v. Bennett*, No. 05 Civ. 2000, 2008 WL 821827, at *13 (S.D.N.Y. Mar. 26, 2008) (citing *Porter v. Nussle*, 534 U.S. at 524-25).  Plaintiff is not required to name all responsible parties in a grievance in order to exhaust his claims when he is making a claim against a group of individuals who participated in the same conduct. *See Albritton v. Morris*, No. 13-CV-3708, 2018 WL 1609526, at *10-11 (S.D.N.Y. Mar. 29, 2018) (citing *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009)

---

[16] This is consistent with plaintiff's statement that defendant Gardner was looking something up on the "computer" and that he told plaintiff that he was "listed" as Protestant.

(the NYS grievance procedure does not contain an identification requirement)). However, plaintiff must "provide 'a specific description of the problem,' that was sufficient to 'alert the prison to the nature of the wrong for which redress was sought,' and provide 'sufficient notice of wrongdoing to cause them to investigate any such claim.'" *Id.* (quoting *Espinal*, 558 F.3d at 127-28).  In addition, the grievance need not "'explicitly discuss the misconduct . . . alleged in the complaint,' so long as the claim was specifically addressed in the prison's denial of the grievance." *Id.* (citing *Espinal*, 558 F.3d at 128); *Percinthe v. Julien*, No. 08-CV-893, 2009 WL 2223070, at *4 (S.D.N.Y. July 24, 2009) ("[A] claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated.")).

Therefore, the question in this case is whether either of plaintiff's grievances alerted the prison officials to the claims that he is raising in this federal complaint.

### 1.    Eighth Amendment

Plaintiff's claim that defendant Nenni threatened him with food "poisoning," and that he was actually served tainted food the following day, is not mentioned at all in grievance #30081.[17]  This grievance focused on the termination of his fiancé's visit and his 48-hour placement in the observation cell.  There was no way that the grievance would have alerted prison officials to defendant Nenni's alleged comment and/or

---

[17] The poisoned food allegations are not mentioned in #30129 either.  In any event, because the food claim was related to, and occurred near the same time as, the visiting incident, it would have been more likely that plaintiff would have included the claim in #30081 which complained about his treatment during and after his fiancé's visit.

actions, and thus, no possibility that any such conduct would have been investigated. In addition, the CORC decision concerned only the termination of plaintiff's visit, the 48-hour special watch, and the urinalysis test. Thus, plaintiff's Eighth Amendment claim against defendant Nenni has not been exhausted and must be dismissed.

### 2. Retaliation

In describing plaintiff's "retaliation claim," Judge Kahn stated that "in the weeks immediately following [plaintiff's arrival at SCF], Defendants interfered with his religious expression, and improperly terminated his visit with his fiancé. (Dkt. No. 10 at 9). Plaintiff alleged "numerous adverse actions," including having his kufi removed from his head, having the visit prematurely terminated, being confined in a 48-hour drug watch, being served tainted food, and having false misbehavior charges filed against him." (*Id.*) Judge Kahn found that these statements "plausibly suggest[] that the misconduct complained of was rooted in animus against his constitutionally protected activity." (*Id.*)

This court has interpreted Judge Kahn's initial order as referring to two protected activities. One protected activity was plaintiff wearing his kufi, which is religious expression, protected by the First Amendment. *See Gill v. Jones*, No. 95 Civ. 9031, 2001 WL 1346012, at *6 (S.D.N.Y. Nov. 1, 2001) ("Constitutionally protected conduct . . . may include not only the filing of grievances, but even the wearing of religious headgear.") (citation omitted). The second protected activity was filing grievances. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (Filing grievances is a constitutionally protected activity).

Although the complaint in this action references filing a grievance against defendant Gardner on February 18, 2016, and alleges that plaintiff was warned about filing "grievances," there is no indication in grievance # 30081 that plaintiff was claiming retaliation for either his "grievances" or for wearing his kufi. In addition, the defendants who terminated plaintiff's visit, which was the subject of #30081, were defendants Connors and Checchia. Defendant Gardner was not involved in the March 31, 2016 visitation incident at all.

Plaintiff states in his federal complaint that Gardner's name was mentioned by defendant Checchia, when he asked plaintiff "what did Lt. Gardner tell [him] about wearing [his] kufi and writing grievances.[sic]"[18] (Compl. at 4). None of these facts were raised in plaintiff's grievance. At the end of # 30081, plaintiff asks that he not be subject to *future* retaliation because of "this Grievance." He does not claim that any of the conduct reflected in the grievance was retaliation for the exercise of a constitutionally protected right.

No retaliation is mentioned in Grievance #30129. The grievance describes the alleged incident at plaintiff's disciplinary hearing in which CO North (not a defendant herein) ordered plaintiff to remove his kufi and then threatened plaintiff after plaintiff mentioned that removing his kufi would be a "violation." The requested relief in the grievance is that the grievance be accepted as "a complaint of verbal harassment, verbal assault, and violation of my religious rights." Plaintiff testified at his deposition that

---

[18] The court must point out that this is one of the statements in plaintiff's complaint that is inconsistent with the evidence in the record. If, as plaintiff testified at his deposition, defendant Gardner never mentioned plaintiff's kufi to him until the April 27, 2016 disciplinary hearing, then defendant Checchia could not have asked plaintiff this question on March 31, 2016.

the other named defendants - Nenni, Checchia, and Connors **never** referenced his religion or his kufi when they took any of the actions that plaintiff describes. (Pl.'s Dep. at 40, 41, 44-45). In addition, from plaintiff's testimony, it does not appear defendant Gardner was present when CO North made his threat.[19] (Pl.'s Dep. at 72). Plaintiff also testified that his grievance on April 27, 2016 was prompted by CO North's conduct. (Pl.'s Dep. at 74).

The CORC's decision noted that plaintiff's allegations were investigated, and both Lt. Gardner and CO North denied harassing plaintiff. The investigation revealed that plaintiff was directed to remove his kufi because he was listed as Protestant in the facility records. (Def.s' Ex. C at 2). There was no discussion of retaliation or investigation into such a claim. Thus, while plaintiff's religion claim is exhausted, his claim that adverse actions were taken against him because of his religion, was never raised in any of his grievances and may be dismissed for failure to exhaust.

With respect to plaintiff's allegations that the defendants' actions were taken against him in retaliation for filing grievances, he also never raised that claim in his grievances. The only specific grievance that plaintiff **alleged in his complaint** that he filed prior to the April 2 and April 27, 2016 grievances was dated February 18, 2016. Plaintiff claims that he filed this grievance against defendant Gardner regarding plaintiff's "religious right to wear a Kufi." (Compl. at 3). Plaintiff states in his complaint that only defendant Gardner and CO North harassed him about the kufi. (*Id.*)

---

[19] Plaintiff testified that he wore the kufi during the hearing, and that CO North escorted plaintiff out of the hearing. (Pl.'s Dep. at 72). During that escort, CO North allegedly told plaintiff to take the kufi off, and threatened him if he refused. (*Id.*) Plaintiff was asked "So Lieutenant Gardner, where was he during the hearing?" Plaintiff responded "I have no idea." (*Id.*)

Even though plaintiff states in the complaint that he filed a grievance against defendant Gardner on February 18, 2016, which would make adverse actions allegedly committed after that date "plausible" retaliation, the February 18, 2016 grievance has not been produced. Plaintiff testified at his deposition, that #30018 and #30129 were the ***only*** grievances that he filed relating to the incidents of which he complains. Thus, neither the terminated visit, nor the drug watch on March 31, 2016 could have been in retaliation for a grievance that does not appear to have been filed.

At his deposition, plaintiff also testified that prior to March 31, 2016, he was not actually sure who "interacted" with him about his kufi. (Pl.'s Dep. at 16-17). Plaintiff also testified that, shortly after his arrival, the kufi was mentioned, but plaintiff discussed the matter with an Imam, who checked with the facility and told plaintiff that there was "some rule . . . out of Albany" which stated that plaintiff could wear a kufi, and the Imam did not understand why "they" were bothering him about it. (*Id.* at 14). Plaintiff thought that one of the officers who approached him might have been female. (*Id.* at 14). Plaintiff states that he was called down to Jumu'ah, and even though he had taken the kufi off,[20] the Imam told him that "it" was in the computer, and plaintiff states he was allowed to wear it until he was approached with "this" incident. (*Id.* at 15).

Plaintiff testified that defendant Gardner "never said nothing [sic] about the kufi until I received a ticket. And I was coming – going – leaving – I was in the disciplinary office." (Pl.'s Dep. at 32). Plaintiff's hearing was on April 27, 2016. (*Id.*) Thus, if defendant Gardner did not mention plaintiff's kufi until the incident on April 27, 2016,

---

[20] Plaintiff testified that he took the kufi off because he did not want "to get these people bothered." (Pl.'s Dep. at 15).

then plaintiff could not have filed a grievance against Gardner on February 18, 2016 concerning plaintiff's right to wear a kufi and defendants' subsequent actions against plaintiff could not have been in retaliation for filing grievances, nor could either of the grievances that plaintiff actually filed have raised a retaliation claim. Thus, plaintiff's claim that defendants' actions were in retaliation for filing grievances is also unexhausted.

### 3.    Equal Protection

Neither of the grievances mention race or any other statement that could be interpreted as plaintiff raising an equal protection claim. As argued by defendants, the plaintiff's allegations in the complaint go well beyond any claims or factual statements that he made in his grievances. Thus, plaintiff's equal protection claim is unexhausted and must be dismissed as against all defendants.

Plaintiff's only exhausted claim relates to the ability to wear his kufi and will proceed to consider the merits of that claim.

## V.    First Amendment Religion

### A.    Legal Standards

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342

(1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of

reasonableness and is less restrictive than the standard ordinarily applied to the alleged

infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected

right withstands a constitutional challenge if that regulation is reasonably related to

legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An

individualized decision to deny an inmate the ability to engage in a religious exercise is

analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir.

2006) (citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the

Second Circuit held that to assess a free exercise claim, the court must determine "(1)

whether the practice asserted is religious in the person's scheme of beliefs and whether

the belief is sincerely held; (2) whether the challenged practice of prison officials

infringes upon the religious belief; and (3) whether the challenged practice of the prison

officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment

religion claim. *Holland v. Goord*, 758 F.3d 215, 220-23 (2d Cir. 2014).  In *Holland*, the

court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-

21. The Second Circuit has not decided whether, to state a claim under the First

Amendment, the inmate must show at the onset that the disputed conduct "substantially

burdens his sincerely held religious beliefs." *Id.* at 220 (citing *Salahuddin, supra* at

274-75; *Ford, supra* at 592 (where the court assumed without deciding that the

substantial burden test applies)).  While the court in *Holland* did not decide the issue, it

assumed the continued validity of the substantial burden test and analyzed the case accordingly.[21] *Id.* at 221. This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595. "Given the difficult judgments attendant to prison operation," a generally applicable policy, even if that policy burdens an inmate's freedom to exercise his religion, will not rise to the level of a constitutional violation if that policy is "reasonably related to legitimate penological interests." *Holland*, 758 F.3d at 222.

### B.    Application

Defendants argue that wearing the kufi was not central to plaintiff's religion, and

---

[21] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

therefore, removing the kufi would not substantially burden the exercise of plaintiff's religion.  Plaintiff testified that he has been Muslim since 2013, but was Protestant prior to that. (Pl.'s Dep. at 22).  He testified that he "filled out" the papers to change his religion of record at Rikers Island, but not at Downstate Correctional Facility. (*Id.*) Plaintiff also testified that he wore his kufi without incident at other facilities prior to being incarcerated at Shawangunk. (Pl.'s Dep. at 23, 27).  Plaintiff also testified that the tenets of the Muslim religion do ***not*** require adherents to wear the kufi, and that such head gear was not specific to the Muslim religion, but that those individuals who chose to do so, have the "right" to wear it. (Pl.'s Dep. at 23).  A substantial burden "'exists when an individual is required to choose between following the precepts of [his] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand.'" *Powlette v. Morris*, No. 13 Civ. 7378, 2016 WL 3017396, at *7 (S.D.N.Y. May 23, 2016) (quoting *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citing *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

However, the court in *Ford* stated that the plaintiff "need not show that the disputed conduct impedes a religious practice mandated by his religion . . . ." *Ford*, 352 F.3d at 593-94.  Instead, he "must show that it burdens a religious practice that is 'central or important' to his practice of religion." *Id.*  It is not totally clear in this case whether the exercise of plaintiff's religion is substantially burdened because although he states that wearing the kufi is not "required" by his religion, he believes that those who wear it have a "right" to do so.  Therefore, there would remain a question of fact as

to whether wearing the kufi was central or important to "his" exercise of the Muslim religion.  Notwithstanding the potential burden on the exercise of his religion, plaintiff's claim may be dismissed.

It appears that plaintiff actually removed his kufi only twice during the time in question.  Defendant Nenni allegedly "snatched" the kufi off plaintiff's head on March 31, 2016.  However, at that time, plaintiff's kufi was taken prior to plaintiff's placement in observation.  All of his clothes were taken due to the nature of the confinement. (Compl. at 4).  Whether defendant Nenni "snatched" the kufi off of plaintiff's head or whether plaintiff gave defendant the kufi, it was being taken for security reasons. Plaintiff was being observed for drug possession.  Even plaintiff understood why he had to give up the kufi during the observation period.

The second time, plaintiff testified that he removed his kufi was when CO North, who is not a defendant herein, was escorting plaintiff out of his disciplinary hearing. (Compl. at 5, Pl.'s Dep. at 71).  Plaintiff testified that he wore the kufi after the incident with CO North, but would remove the kufi if he saw North come into his housing unit. (Pl.'s Dep. at 77).  Defendant Gardner, allegedly told plaintiff to take the kufi off before the hearing, but never enforced that order, and plaintiff wore the kufi during the hearing.[22]  Plaintiff was asked whether defendant Gardner "ever ma[d]e any comments to you about your religion or about your kufi, other than in that one time before [his] hearing?" (Pl.'s Dep. at 76).  Plaintiff answered: "No." (*Id.*)

Plaintiff testified that he was allowed to wear the kufi in his cell, but took it off

---

[22] Defendant Gardner was not the hearing officer, and there is no claim that the hearing officer even mentioned the kufi.

for security searches. (Pl.'s Dep. at 27).  Plaintiff stated that, shortly after he arrived at

Shawangunk, defendant Gardner called him into his office and told plaintiff that he did

not "know who [plaintiff was] working for, and . . . why Albany sent [plaintiff] to this

facility," but if plaintiff was not going to follow the rules, he was "going to have a hard

time." (Pl.'s Dep. at 30).  Plaintiff stated that he began receiving more "tickets" than

ever before after this encounter with Gardner. (*Id.*)  Defendant Gardner also allegedly

told plaintiff that he was "known for working with officers," but that if plaintiff was not

willing to help Gardner "in the things that he got going on in his facility . . . I would

have a hard time." (Pl.'s Dep. at 31).  Plaintiff testified that Gardner never mentioned

plaintiff's kufi or religion at that first meeting, even though plaintiff was wearing his

kufi at the time. (*Id.*)

At his deposition, plaintiff testified that defendant Gardner never said anything

about plaintiff's kufi "until [plaintiff] received a ticket," and he was in the disciplinary

office.[23] (Pl.'s Dep. at 32).  Plaintiff stated that defendant Gardner went "on the

computer"[24] and then told plaintiff to take the kufi off because "I don't want you

wearing that kufi in my facility, your're flagging your colors." (*Id.*)  Plaintiff explained

---

[23] Plaintiff's disciplinary hearing was on April 27, 2016. (Def.s' Ex. C at 1).

[24] Later during the deposition, plaintiff testified that when defendant Gardner went to the computer, he came back to tell plaintiff that he was listed as "Protestant" and was not allowed to wear the kufi in "this" facility. (Pl.'s Dep. at 70).  Defendant Gardner then told plaintiff to take the kufi off, but plaintiff did not remove it. (*Id.* at 71).  Plaintiff kept the kufi on through the hearing, and it was only after the hearing that CO North threatened plaintiff, and plaintiff took the kufi off. (*Id.* at 72). However, plaintiff testified that defendant Gardner was not present when CO North told plaintiff to take the kufi off. (*Id.*)  Plaintiff testified that he filed the grievance because of CO North's conduct. (*Id.* at 74).  Plaintiff then stated that he continued trying to complete the proper paperwork to change his religious designation to Muslim for Shawangunk. (*Id.*)  "[T]hey pushed forward with the whole getting the imam involved again in signing the religion form to put me in the computer." (*Id.*)

that defendant Gardner meant that he was afraid that plaintiff was showing his gang affiliation by wearing a red kufi. Plaintiff stated that he told Gardner that he had not "been gang affiliated since 2009," but that Gardner "just felt like [plaintiff] was flagging colors with the color that I represented at one time with having it. [sic]" (*Id.*) Plaintiff conceded that, at one time, he was affiliated with the "Bloods" gang. (Pl.'s Dep. at 32-33). Plaintiff specifically referred to the red kufi that he was wearing during the deposition, and stated "one would consider it . . . as a Blood member, or [that I was] flagging Blood colors." (Pl.'s Dep. at 33).

Plaintiff again confirmed that Gardner never said anything to plaintiff about his kufi until the disciplinary hearing, but that Gardner had received "reports" that "they" were warning plaintiff about the kufi, but that he would not take it off. (Pl.'s Dep. at 34). There was no discussion about religion "at all." (*Id.*) Plaintiff also conceded that, up to that point, none of the defendants specifically told plaintiff not to wear his kufi. (Pl.'s Dep. at 35). Plaintiff stated that the only individual with whom plaintiff spoke "prior to the visit," was defendant Nenni, who was "gang intelligence" for the facility. (Pl.'s Dep. at 35). Defendant Nenni allegedly asked plaintiff to "report" to the officers if he had any information about "weapons or anything of that nature . . . ." (*Id.*)

Plaintiff testified that the only time that Gardner said anything about plaintiff's kufi was the one time during the disciplinary hearing, and none of the other defendants ever mentioned the kufi "at all." (Pl.'s Dep. at 76). The only time that plaintiff was without his kufi was during the one-on-one watch, and after CO North threatened him. (*Id.* at 76-77). Even then, plaintiff testified that he was allowed to wear the kufi in his

cell and going to the "rec pen."  Plaintiff would only take the kufi off when CO North came into the housing area, and after he "clarified it" with the grievance, he was allowed to wear the kufi again. (*Id.*)

Plaintiff stated that it took approximately two weeks to clarify, and that CO North was the only reason that he did not wear his kufi during that time. (*Id.*)  The CORC's decision stated that plaintiff was told to take his kufi off because he was listed as a Protestant on facility records. (Def.s' Ex. C at 2) (Dkt. No. 21-6).  Plaintiff also specified in the grievance that CO North was the individual who told plaintiff to remove his kufi and then threatened him when he refused. (Def.s' Ex. C at 1).  Both defendant Gardner and CO North denied threatening plaintiff. (*Id.* at 2).  The CORC also noted that in the interim, DOCCS policy had changed regarding "religious items," and inmates could "select any of the approved religious items regardless of their Religion of Record." (*Id.*)

Even though the CORC did not mention the discussion that plaintiff allegedly had with defendant Gardner about gang colors, the plaintiff's claim may be dismissed under either version of the facts.  It is clear, assuming the truth of plaintiff's own testimony, that defendants Gardner and Nenni were both more concerned with plaintiff's possible gang affiliation, rather than his religion.[25]  If plaintiff was listed as Protestant, and yet he was wearing a red kufi, it would have been reasonable to believe that he was attempting to show gang affiliation, which is a potential security risk.  Even

---

[25] Later in the deposition, plaintiff was asked why he thought defendant Gardner was "singling [him] out." (Pl.'s Dep. at 82).  Plaintiff testified that it was because he "wouldn't give him no [sic] information concerning anything that was going on with the facility." (*Id.*)

if plaintiff's religious affiliation had been changed to Muslim as plaintiff claimed he had done at another facility, it would still have been reasonable for defendants to attempt to avoid a confrontation with other inmates who could have viewed the red kufi as a gang sign. *See e.g. Vann v. Fischer*, No. 11 Civ. 1958, 2014 WL 4188077, at *10 (S.D.N.Y. Aug. 25, 2014) ("It is undisputed that inmates display specific colors to demonstrate alignment with gang factions within the correctional system; prohibiting the display of such colors decreases the risk of inter-faction violence.")

In *Vann*, the court upheld a requirement that inmates keep their religious beads concealed beneath their clothes to decrease the likelihood that such beads could be used for unauthorized purposes. *Id.* "Conduct expressly aimed at protecting prison security is 'legitimate' beyond question and is in fact 'central to all other correctional goals.'" *Id.* (quoting *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004)) (internal quotation marks omitted). Thus, defendant Gardner's actions were reasonable, and any conduct that could have been considered unreasonable was by CO North, who is not a defendant in this action and who did not engage in the alleged conduct in front of any of the named defendants.[26]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 21) be **GRANTED**, and his complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

---

[26] Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). If none of the named defendants were the individuals who allegedly harassed plaintiff about his kufi, then they may not be held liable even if a violation had occurred.

fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 19, 2018

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**